## ESTATE OF JAMES DUNDAS, DECEASED.

APPEAL BY W. O. DUNDAS FROM THE ORPHANS' COURT OF PHILADELPHIA COUNTY.

Argued March 27, 1890—Decided October 6, 1890.
[To be reported.]

1. A residuary legatee, the wife of one of the executors of the testator, in the absence of fraud, may purchase, through the medium of her husband, acting as her agent, the share of another residuary legatee; and, in such circumstances, the rule which prohibits a trustee from buying at his own sale has no application.
2. When a residuary legatee sold and conveyed his interest to the wife of one of the executors, at a price ascertained by an estimate made for the purpose by the executors, the fact that, through errors in and omission of data from such estimate, the price was fixed at much less than the share was really worth, will not necessarily invalidate the sale.

Statement of Facts.

3. If such errors and omissions were unintentional and honest mistakes, naturally arising from the peculiar state of the assets, and the sale was not tainted by any fraud, it will not be set aside, although the purchaser was represented in the transaction by her husband, and the seller relied entirely upon the statements of the executors.

4. At all events, even if such sale were voidable at the election of the seller, he must act with reasonable promptness in moving to have it set aside; and a delay in so moving for two years after the purchaser, learning of his dissatisfaction, offered to re-convey upon re-payment of the price, with interest, is such laches as works an estoppel.

Before PAXSON, C. J., STERRETT, GREEN, CLARK, WILLIAMS, McCOLLUM and MITCHELL, JJ.

No. 336 January Term 1889, Sup. Ct.; court below, No. 47 June Term 1878, O. C.

On April 15, 1871, William Oswald Dundas presented a petition, praying for a decree that a certain deed conveying and assigning to Agnes Dundas Lippincott, the interest of the petitioner as one of the residuary legatees of James Dundas, deceased, in the estate of said decedent, be set aside, upon the ground that said deed was obtained from the petitioner for an inadequate consideration, through misrepresentation, concealment and imposition, etc., and praying that the executors of the decedent's will be ordered to pay to the petitioner his full share of the estate, notwithstanding such conveyance thereof.

A citation having gone out against Agnes Dundas Lippincott and Joshua Lippincott, her husband, and the executors of the will of James Dundas, deceased, the respondents demurred to the petition, upon the ground of want of jurisdiction in the court. The Orphans' Court sustained the demurrer and dismissed the petition, directing, however, that the executors hold the share claimed by the petitioner properly invested, until the petitioner could be heard in a court of equity. On appeal to the Supreme Court, the decree was reversed, the demurrer overruled, and a procedendo awarded: Dundas's Est., 73 Pa. 474. Thereupon, the petition having been amended in some of its averments, and answered, and a replication to the answers having been filed, the court appointed Mr. W. J. McElroy auditor to take proof of the facts and circumstances set forth in the petition, and to report an account against the defendants if necessary.

Statement of Facts.

In the fall of 1877, after he had taken the testimony, Mr. McElroy died. The petitioner then filed a request for an issue to determine the question of fraud in procuring the conveyance of his interest from him. On June 29, 1878, the court refused the request for an issue, and appointed *Mr. Samuel C. Perkins* auditor, in the place of Mr. McElroy and with like instructions. While the matter was pending before Mr. Perkins, Joshua Lip pincott died, having appointed Agnes Dundas Lippincott as his executrix, and by agreement of all parties, the record was amended by making the proper suggestion and substitution.

On February 5, 1887, the auditor filed his report, finding, in substance, the following facts:

James Dundas died July 4, 1865, having by his will, which was duly proved on July 10, 1865, divided his residuary estate into forty equal parts, devising and bequeathing five thereof to the children of William H. Dundas, deceased, in equal shares. As one of the four children of William H. Dundas, the petitioner was entitled to the one fourth of five fortieths, or one thirty-second, of the residuary estate under the will. The will also gave three fortieths of the residuary estate to the respondent Agnes D. Lippincott, sixteen fortieths to her son James D. Lippincott, and twelve fortieths to her daughter, Anna M. D. Lippincott. The testator appointed as his executors, Joshua Lippincott, Richard Smethurst and James D. Lippincott, conferring upon them a power to sell real estate, which as the Supreme Court decided, on an appeal from the Orphans' Court, in connection with the settlement of the first account of the executors, worked a conversion of the realty embraced in the residuary estate: Dundas's App., 64 Pa. 325.

At the time of the testator's death, the petitioner was between twenty-three and twenty-four years of age, and unmarried. He had no employment, had not been brought up to any kind of business, and was not familiar with book-keeping. He was residing on a farm near Washington, D. C., belonging to his three sisters and himself, and inherited from their parents. He was married September 21, 1865, and during the following winter he and his wife spent some time in Philadelphia. During his stay there, he consulted counsel as to the propriety of contest-ing the will of the testator, upon the ground of undue influence upon the testator, exercised by Mrs. Lippincott and her husband,

but that idea was finally abandoned. In company with his counsel, Mr. Joseph T. Thomas, he went to the register's office and examined the inventory which had been filed there by the executors, and Mr. Thomas remarked to him that the assets were all appraised at the lowest figure, to save collateral inheritance tax. In interviews which he had with the executors, the petitioner made inquiries as to the probable value of his interest in the estate, but was informed that they were unable, as yet, to tell him what he would receive.

On January 6, 1866, the executors made a distribution of the income of the estate for the first six months, the petitioner receiving $533.32 as his share thereof. Shortly before this he had applied to the executors for a loan of $1,500 on the credit of his interest in the estate, but the executors declined to make it. At the time of this first distribution, however, Mrs. Agnes D. Lippincott lent him the $1,500, taking a pledge of his interest in the estate as security for its re-payment. On July 6, 1866, the executors made a second distribution, in which the petitioner's share was $4,932.27, and, after the deduction of the amount due to Mrs. Lippincott on account of the loan made to him, he received the remainder of his share in cash.

Soon after the second distribution, the petitioner, having previously consulted with his sisters, with counsel and with friends, upon the subject of making a sale of his interest in the estate, receiving advice adverse to the project, and having attempted, without success, to sell it to several persons, opened a correspondence on July 19, 1866, with Joshua Lippincott, one of the executors and the husband of Agnes D. Lippincott, in regard to such a sale, offering to accept from him whatever he might consider a fair valuation. Mr. Lippincott, on August 8, 1866, replied to the letter of July 19th that absence from home prevented him from receiving it until that date, and saying: " In regard to purchasing your interest in your uncle's estate, as an executor I cannot do so. The thirty-one fortieths however, if they could purchase the entire five fortieths owned by yourself and sisters, I should approve. After consulting with them in regard to the same, I will be pleased to hear further from you."

The thirty-one fortieths referred to in this letter were the interests owned by the wife, son and daughter of Mr. Lippin-

Statement of Facts.

cott.   As the result of some further correspondence, the petitioner came to Philadelphia in October, 1866, and had an interview with Joshua Lippincott, who informed him that Mrs. Lippincott would take his share at its appraised value, and he agreed orally to sell it then at that value.   A calculation, theretofore prepared by Mr. Lippincott and Mr. Smethurst, was then exhibited to him, showing an estimated valuation of the estate as of October 6, 1866, and resulting in his one thirty-second share being valued at $13,802.57, and, deducting the $4,932.27 which he had received in July, 1866, there was left $8,870.30. This calculation contained estimates made upon three different bases, and the valuation of $13,802.57 was arrived at by taking the average of the three results.   No copy of the calculation was furnished to the petitioner.

The journal of the estate, which contained the inventory and appraisements, including that for the collateral tax, the cash book, which contained the receipts of income and expenditures and disbursements, and the minute book, which contained statements of receipts and disbursements of principal and income, were shown and explained to petitioner as far as was possible in the not very long interview.   It did not appear that the books were shown to him at any other time, or that he had any other opportunity to examine them.   The ledger was not shown to him, nor the record or title-book of the real estate, in which all sales of property were entered. The actual receipts from sales of real and personal estate, all but one of which had been made prior to July 6, 1866, were not stated to petitioner, nor did the increase thereon, if any, enter into the calculations, although included in the first account of the executors afterwards filed.   Petitioner made no inquiry from any one, except from Mr. Smethurst and Joshua Lippincott, as to the value of the estate or the particular items composing it.   " The explanations and information given by Mr. Lippincott to the petitioner, seem to have been of a very general character, without referring in detail to the items. . . . So far as his testimony shows any reference to details, in his interviews with the petitioner, it was as to expenses and outlays, particularly the heavy expenses of the coal lands in Schuylkill county and the great cost of the mausoleum." " The petitioner, so far as the testimony shows, did not get any

fuller or more detailed explanation or information from Mr. Smethurst." Mr. Smethurst was secretary of the trustees of the Pratt estate, and was thoroughly conversant with all the details of it. The testator's undivided one fourth interest in that estate was "valued exclusively by him," but the petitioner was afforded no information or explanation beyond that valuation. "Petitioner was not informed that in fact some, if not all, the stocks and securities in the inventory were then selling at higher prices." "No intimation even was given of any possible increase over the appraised values; but the expenses and necessary disbursements, and the unproductiveness of the properties were, according to Joshua Lippincott's own testimony, largely dwelt upon and emphasized both by himself and Mr. Smethurst in the information and explanation which was given to petitioner." "As regards the . . . . . claims against the estate, . . . . . the probable large amount of these, with some mention of detail, was specially pressed on the attention of the petitioner. There was not the same anxiety to make known to him either the actual increase on the items specified, or the possibility of any advance in the valuations of the items not actually disposed of."

After making the arrangement for the sale of his interest to Mrs. Lippincott, the petitioner returned home. Instructions were given by Mr. Lippincott and Mr. Smethurst to Mr. George W. Biddle, as counsel for Mrs. Lippincott, to have a proper deed drawn with all the necessary papers. Searches were ordered against petitioner, and the matter was in preparation. No time was fixed for the payment of the purchase money. The calculation was submitted to Mr. Biddle, who inquired of Mr. Smethurst if it was an "accurate one," and he replied that it "was a very liberal one."

By arrangement, the petitioner came to Philadelphia again on November 5, 1866, and the next morning went, with Mr. Lippincott, to the office of Mr. Biddle, who read to him the deed which had been prepared, and gave him instructions as to its execution by himself and wife. At that time, the petitioner executed a declaration, prepared and engrossed in Mr. Biddle's office, as follows:

"I have examined and considered the condition of the estate of the late James Dundas, and certain statements showing the

present value thereof furnished to me by the executors, all information relating to the subject having been freely given to me by the executors of Mr. Dundas; and I am satisfied that a fair valuation of the whole residuary estate in which I am interested, including the principal of the annuities hereafter to fall in, is the sum of $441,682.40, and upon this basis of valuation I have requested Mrs. Agnes Dundas Lippincott to purchase of me my one fourth part of five fortieths of said residuary estate, which she has agreed to do; and I am acting in this sale of my residuary estate with a full knowledge of my interest in said estate, and without any persuasion or influence of any kind. Witness my hand and seal this sixth day of November A. D. 1866. " WILLIAM OSWALD DUNDAS. [L. S.] "

The deed recited the residuary clause of the will; the desire of the petitioner to sell his interest, present and expectant, in the testator's residuary estate; that for this purpose an appraisement thereof had been made by all the executors, submitted to and examined and approved by the petitioner; the agreement of Agnes D. Lippincott to purchase at the appraised valuation, a part of which had been already paid to the petitioner, viz., $4,932.27; and it named, as the consideration of the conveyance, the residue of said appraised value, to wit, $8,870.30.

On November 8, 1866, the petitioner brought back the deed duly executed, delivered it to Mr. Lippincott and received from him two checks drawn by Agnes D. Lippincott, one for $8,870.30, the consideration mentioned in the deed, and the other for $1,129.70, the two making together $10,000. The second check was given to bring the amount up to $10,000, which the petitioner had stated he was in urgent need of, for the purchase of a house in Baltimore, and Mr. Lippincott told him that this additional amount was paid on account of the regard Mrs. Lippincott entertained for his wife, and out of her own private means, as there was due to him from the estate only some $8,000.

The petitioner had never seen Mrs. Lippincott prior to the delivery of the deed and the receipt of the money, in regard to the purchase by her of his interest in the estate, nor had she had any conversations with him on the subject. The whole

matter was transacted through her husband, who acted for her
and as her agent.   She had never named any specific price, but
on or about September 21, 1866, as testified by her husband,
had come to the conclusion to buy the share of petitioner "at
whatever price his share was estimated to be worth by a care-
ful valuation made by the executors."

Of the money that he received for his interest, the petitioner
spent about $1,000 in paying debts, and $5,500 on account of
the purchase money of the Baltimore house.   He paid after-
wards for some additions he made to the house.   The balance
of the money he kept in bank, drawing upon it as his necessi-
ties required.   About a year after he bought the house, he ex-
changed it for a smaller one and got some $1,500 cash in the
exchange.   This house he rented for $450 a year for about two
years.   He went into a building association, which advanced
him money upon a mortgage of the property.   He had gone to
Baltimore to accept a situation in Adams Express Company,
and, after being in their employ some time, lost the place owing
to a curtailment of the force, and, being unable to keep up the
dues to the building association, they sold the property under
the mortgage and bought it in about the year 1869.

The earliest intimation of petitioner's dissatisfaction with
the sale of his interest to Mrs. Lippincott was when he appeared
before Mr. Drayton, the auditor upon the first account, in the
latter part of December, 1868.   On April 5, 1869, Mr. George
W. Biddle, attorney for Mrs. Lippincott, wrote Messrs. Burton
and Porter, as attorneys for William O. Dundas, stating that
when he (Mr. Biddle) communicated what had taken place
at the audit to Mrs. Lippincott, she pronounced the allega-
tions as to the share of petitioner having been obtained at an
inadequate price under some misrepresentation to be untrue;
but that, not desiring a controversy upon the subject, she had
authorized Mr. Biddle to say that if petitioner "would repay
to her, with interest, what he had received, he might stand ex-
actly where he had been before selling out his interest."   Mr.
Biddle further wrote that he had made the statement to Judge
Porter early in the year, perhaps on two different occasions,
and somewhat later to Mr. Burton, but that no reply to the
offer had ever been received, and that as she did not wish the
matter kept open indefinitely, Mrs. Lippincott requested him

## Statement of Facts.

to state in writing, on her behalf, that " as she purchased this share out of regard to the memory of her uncle, under great persuasion from Mr. William O. Dundas, who had been unsuccessfully offering it for sale to various parties in this city, it will be agreeable to her to re-convey it to him with all its incidents, upon being repaid principal, interest and all expenses, provided this be done on or before the 20th inst."

On April 8th Mr. Burton wrote Mr. Biddle acknowledging the above communication as received on the 7th through Judge Porter, but declining to make any reply on Mr. Dundas's account, as he did not regard himself as his counsel. On April 9th Mr. Burton wrote petitioner enclosing the letter of Mr. Biddle with a copy of his own reply, "in order that you may understand our position in the matter." Mr. Burton's communication to petitioner, with its enclosures, was sent to him by mail, addressed to Baltimore, where he then lived, but owing to his absence in Washington, it did not reach him till April 23d, three days after the limit fixed for acceptance of the proposition. He did not reply to it in any way.

In the latter part of March, 1871, the petitioner's wife came to Philadelphia and had two or three interviews with Mrs. Lippincott, at one of which Mr. Lippincott was present, and an offer was made to Mrs. Lippincott by Mrs. Dundas, on the part of her husband, of $12,650 in lieu of the money she had paid for his share. This offer was not accepted. Mr. Dundas had arranged to get the money to make the payment; but had not been in a position to repay at any time previous.

—The auditor went into an elaborate examination of the details of the calculations exhibited to the petitioner at the time he made the contract of sale, and, as a result of such examination, reported that there were large and numerous errors and omissions therein, which resulted in the appraisement of the petitioner's interest in the estate at a very inadequate valuation. He reported, also, that down to the date of the third account of the executors, July 4, 1875, they had realized from real and personal estate some $336,000 over and above the valuations given in the inventory and appraisement of the estate. The largest item in this increase was an advance of over $192,000 received upon the sale of the testator's interest in the Philadelphia & Mahanoy Coal Company, early in March, 1871. There was testi-

mony tending to show that in 1866, in consequence of troubles between the coal company and the Philadelphia & Reading Railroad Company, the stock of the former was depressed, and that sales of it were made as low as $37.50 per share by holders, but that in 1871, the management of the railroad and its policy having changed, the whole capital stock of the coal company was purchased by F. B. Gowen, president of the Philadelphia & Reading Railroad Company, for its benefit, at a large advance.

In 1871, pending the audit upon the second account of the executors, Mrs. Lippincott purchased the interests of the petitioner's sisters for $20,000 each. It was shown that they had been carrying on litigation against the executors in connection with the settlement of the estate.

Having found the facts, in substance as above, the auditor reported further, in part, as follows:

The case presents features peculiar in itself: counsel on either side did not refer to, and the auditor has been unable to find, any one exactly parallel. Yet there are some facts in the case which present its leading features without dwelling upon the details, which are fully set forth in the findings of fact by the auditor. The sale was not by a trustee from himself of part of the assets of the trust estate, nor was it directly to a trustee by the cestui que trust; it was a purchase by one residuary legatee from another of the whole of a $\frac{1}{33}$ undivided share in the residue of an unsettled decedent's estate; but the purchaser was not only a co-residuary legatee, but was the wife of one of the executors, who acted as agent for her in the negotiations preliminary to the execution of the purchase, the purchaser herself taking little or no part in the matter beyond signing the checks for the money which was paid upon the execution of the deed of assignment of the share, and designating the consideration which she was willing to pay for the same, to wit, whatever it was estimated to be worth by a careful calculation to be made by the executors. . . . .

The purchase of the share was made only a year and four months after the testator's death, and before the executors had settled and filed any account. The purchaser with her two children, one of whom, her son, was also an executor of the will, represented $\frac{1}{40}$ of the residuary estate. She and her hus-

band were also entitled under the will each to an annuity of $10,000, besides being recipients of sundry specific legacies comparatively of small values; and the son, also, received a specific legacy and the devise of a farm in Delaware, and of a place or farm in the First (now Twenty-sixth) ward in Philadelphia, of considerable value, adjoining the lands included in the residuary estate.

The sale was not in any sense at the solicitation of the purchaser. The seller was anxious to realize upon his share of the estate without awaiting its settlement. . . . . No price was ever set by the seller, nor was any valuation ever fixed or even suggested by him or on his behalf, upon his interest. Nor was any specific examination made by or for him into the condition and value of the estate, with a view to this particular proposed sale; nor did he consult counsel or have independent advice in respect to it as to values, for which he relied upon the estimates and calculations prepared by the executors, with whatever light he may have had from such information as he had gleaned from previous inquiry made without special reference to this sale, and his looking at the books of the estate for a short time when shown to him by the executors just prior to the sale. His reliance, however, was upon the representations of the executors, which were urged by them as correctly exhibiting the condition and value of the estate and of his interest in the residue thereof, which they, as executors, undertook for the purchaser to fairly represent to the seller; and by reason of this confidence, to quote the language of Lord Chancellor THURLOW, in Fox v. Macreth, 2 Cox 327, "to be sure, it makes fully as strong a case as that of a trustee."

The representation of the value of the estate, and the interest therein proposed to be sold, the auditor finds was incorrect in the premises upon which the estimate of value was founded, and in the methods through which the resultant estimate was reached. While the facts as above reported fully justify this finding, yet the important question remains, was this incorrectness through fraud or mistake? Fraud must be proved, and not assumed or lightly to be inferred; and very great latitude is allowed in the introduction of facts in proof of its allegation in any case.

The auditor, however, after a most thorough and careful and

Auditor's Report.

repeated examination and consideration of the actual and absolute or naked facts of the case, which covered a very wide range, cannot find that there was in this incorrect representation and valuation, fraud upon the part of the executors, who had thus placed themselves in such a relation of confidence to the seller. The auditor finds as a fact that this representation of the condition of the estate, and of the value thereof and of the seller's interest therein, was incorrect, but that it was not fraudulent. It was a mistake, and such a mistake as would not unnaturally arise from the peculiar character of the assets of the estate, and its complicated nature, and the complex relations of all the parties concerned. The auditor is of opinion, and so finds, that, however mistaken the executors were, yet they honestly believed that the representations they made to the seller, the petitioner, were correct and fair for the purposes in view.

But, even when on a purchase by a trustee for sale from his cestui que trust, he may have given an adequate price and gained no advantage, it will be set aside at the option of the cestui que trust, unless the connection between them most satisfactorily appears to have been dissolved, and unless all knowledge of the value of the property acquired by the trustee has been communicated to this cestui que trust. . . . .

—Citing Fox v. Macreth, 2 Cox 327 ; Ex parte Bennett, 10 Ves. 381, 400; Randall v. Errington, 10 Ves. 423 ; Hill on Trustees, 156–159, 537, and Delamater's Est., 1 Wh. 362, the auditor continued :

The auditor is of the opinion, in view of all the facts found and of the principles of law indicated, that the present case is one which entitles the petitioner to relief in equity, by setting aside the sale of his interest in the residuary estate of James Dundas, deceased, and the deed which he executed and delivered therefor, November 7, 1866, to Mrs. Agnes D. Lippincott; and that he be admitted to claim against the estate for his interest therein under the residuary clause of the will, subject to proper credits for all the moneys he has actually received either from the estate itself or from the purchaser of his share, provided that he is not barred by laches.

—Considering Ashhurst's App., 60 Pa. 290 ; Evans v. Borie, 3 W. N. 36 ; Evans's App., 81 Pa. 278, 294, 295 ; the auditor concluded :

Aside from any question of trust, though the language of Lord Chancellor THURLOW, as cited above from Fox v. Macreth, would justify the holding of the " confidence " of the seller in the purchaser to be " as strong as any trust," yet here is a proceeding to set aside a transaction after a lapse of the interval from November 7, 1866, the date of the deed, to April 15, 1871, the date of filing the petition, a period of but four years and five months, and the facts do not show any reason in the judgment of the auditor for departing from the general rule laid down in Ashhurst's Appeal, that six years is necessary to a bar to a claim to set such a transaction aside. The seller, in the present case, certainly did object at least as early as December, 1868, about two years after the transaction, and he objected also subsequently more than once. His objection was known to the purchaser certainly with sufficient distinctness to prevent any dealing with the property transferred in a manner inconsistent with any trust or confidence. There is no evidence, indeed, of any dealing by the purchaser with this undivided interest in any way particularly or specifically prior to the filing of the petition. She had received no part of the property upon the distribution under the auditor's report on the first account, for the dividend to petitioner's share was not quite equal to what he had already received. The relative position of the parties had not been changed in the interval of time before the petition was filed. The practical question of relief sought and the manner in which it can be afforded is reduced to a mere arithmetical calculation with proper adjustment of interest.

The auditor accordingly finds that the petitioner's claim is not barred by any laches in seeking to have the transaction set aside, and that he is entitled to relief in the form above mentioned; and consequently an account is necessary to be stated, and is as follows, the executors' accounts as filed being taken as the basis, as the auditor does not deem it necessary to enter upon the questions of disallowance and surcharge, which were contested upon these several accounts :

—The auditor then stated an account, finding that there was due to the petitioner from the estate a balance of $10,393.44 as of date July 5, 1875, with interest thereon ; that the petitioner would be entitled further to receive his share of the net income

of the estate after July 5, 1875, and of the principal of the estate remaining undistributed, when further accounts should be filed by the executors; and that the costs of the proceeding should be paid by Mrs. Lippincott.

Exceptions to the report upon the part of both the petitioner and the respondents were filed with and overruled by the auditor, and afterwards renewed before the court. Among the exceptions of the petitioner, was one complaining of error in not finding that the valuation made of the petitioner's interest was fraudulent, and that the deed for the sale of his interest was procured by misrepresentation, concealment and imposition, practiced by the executors.[23] After argument, the court dismissed the petitioner's exceptions, and sustained the exceptions filed by the respondents, in the following opinion by ASHMAN, J.:

This case may be said to have attained to the dignity of old age. It has outlived two of the judges before whom the petition first came, the master to whom it was originally committed, and the principal co-respondent; and its accumulated evidence is now collated in a report which contains more and minuter subdivisions than one of Chillingworth's sermons. Yet it presents the single question whether the sale by the petitioner of his interest in the decedent's estate is open to the charge of mistake or fraud.

The starting point in this investigation is the attitude which the bargaining parties assumed to each other. Manifestly the same facts will bear one interpretation where easy credulity is at the mercy of acute and practiced cunning, and another and different interpretation where each side is pitted against its antagonist and relies upon its own shrewdness to secure the advantage. Counsel did not overlook this consideration. With a vividness of coloring which did credit to the eloquence of the advocate, but was not so flattering either to the intellect or morals of the client, the petitioner was pictured as a wholly illiterate youth, who united to the shiftlessness of a spendthrift the profligacy of a debauchee, and who was so impoverished by his excesses that he was eager to sell his inheritance at any sacrifice. He was described, somewhat incongruously, as a country bumpkin, a Mulberry Sellers, and a Prodigal Son. Happily for his future, the hero of these titles failed to exhibit in his

private life the character which had been assigned to him in fiction. He was rather remarkable for his industry and acumen. He drove an express wagon at one time, and was then promoted to a clerkship; and after marrying an estimable woman, he purchased a home for her with the first moneys he received from the estate. He had even a surplus for charity; and he piously declared that the seed which he had scattered in that field had yielded a hundredfold. These deeds of beneficence and this providence of resources, rather than his poverty, were the arguments he plied with those whom he solicited as purchasers. His overtures for the sale of his interest were made, too, only after he had sought the advice of counsel here and elsewhere, all of whom attempted to dissuade him from his purpose, and after an unsuccessful effort to annul the will of the testator; and his receipt, when the sale was consummated and the money paid over, was accompanied with the declaration that he had acted in the transaction with a full knowledge of his interest in the estate, and without any persuasion or influence of any kind whatever. This summary, based upon a careful study of all the evidence, enables us to say with emphasis [that the parties to the sale stood at arms' length, and were in law equally matched.] [3]

We do not overlook in this assertion that the estate of which this interest was part, included in it assets whose character was so speculative that only those who, like the respondents, were familiar with their history, could form a reliable judgment as to their values; nor that the accounts of the estate were so complicated that no scrutiny on the part of the petitioner would have given him a clue to their meaning. Nor do we forget that his inspection of those accounts was a matter of the merest form. But it was an inspection of his own devising; he could have employed experts and he could have consulted counsel. Neither of these aids could have been furnished by the respondents, for the obvious reason that both expert and counsel would have been their agents, and, theoretically, at least, hostile to the petitioner. What took place before the sale is as significant as anything which followed it. The petitioner was in the market; he had importuned his relatives and strangers to buy; in the language of more than one witness, he had hawked his wares about town. The respondents, so far from bidding for his interest, repulsed his proposals. To adopt the words of the Mas-

ter of the Rolls, in Moth v. Atwood, 5 Ves. 845, the petitioner "was determined to sell this reversion, and if the law will not prevent a man from selling, it would be too much for a court of equity to say any bargain upon the subject will be bad. . . . . It is clearly admitted it was offered over and over, to all the town, to twenty persons. That circumstance is decisive, and would alone be sufficient to dismiss a bill brought at the distance of twelve years from the transaction. This man (respondent) was not going about, or lying by, to avail himself of an opportunity to get a good bargain." It is important to notice, also, that the petitioner was not exposing for sale an expectant interest, as was erroneously stated at the argument; his interest was vested, and therefore not within the rule which annuls a contract with an heir for mere inadequacy of price: Davidson v. Little, 22 Pa. 252. The respondents have this moral advantage, that in all their verbal declarations to the petitioner they never under-estimated his prospects in the estate. He was told by the husband of the purchaser that he would be amply provided for through his legacy; and his wife was told by the purchaser that his interest would amount to $50,000. If, in the face of these statements, he deliberately waived all inquiry, and accepted $15,000 as the price of his portion, he can offer no plea for relief which will avail him, except fraud, or mistake which was tantamount in its effects to fraud.

The master finds that there was no fraud. But he reports that there were certain errors in the calculation of values, which we must assume, upon his hypothesis of innocence, were accidents which so vitiated the result as to absolve the petitioner from his contract, and relegate him to his original estate. The finding of the master upon this point must command attention. He appears to have taken six years, dating from the close of the hearings before him, to reach his opinion, and the result of that profound study is thus given :

"The auditor finds as a fact, that the representation of the condition of the estate, and of the value thereof, and of the seller's interest therein, was incorrect, but that it was not fraudulent. It was a mistake, and such a mistake as would not unnaturally arise from the peculiar character of the assets of the estate and its complicated nature, and the complex relations of all the parties concerned. The auditor is of opinion,

Opinion of Court below.

and so finds, that, however mistaken the executors were, yet they honestly believed that the representations they made to the seller, the petitioner, were correct and fair for the purposes in view."

To state the case more plainly, the master has imposed upon an arithmetical blunder the severest penalty which is ever inflicted upon a patent fraud. He says that Fox v. Macreth, 1 Lead. Cas. in Eq. 92, 2d ed., sustains him. We do not see the force of the reference. The trustee in that case bought from himself, under a special confidence which he abused, and before the completion of his contract, resold at a large profit. Lord ELDON, in indorsing the judgment which was rendered, and declaring that a purchase by a trustee, even for an adequate price, will be set aside, excepts the case in which all knowledge of the value of the property acquired by the trustee, has been communicated to the cestui que trust. He says : " The rule I take to be this : not that a trustee cannot buy from his cestui que trust, but that he shall not buy from himself. If a trustee will so deal with his cestui que trust that the amount of the transaction shall shake off the obligation that attaches upon him as trustee, then he may buy : " Ex parte Lacey, 6 Ves. 625. [The present is the case of the sale by one cestui que trust to another, to which the trustee was not a party, and in which he acted by consent of the seller and buyer, as the agent of both.] [7] His mistake, unless caused by the party who is benefited, cannot avoid the contract.

This leads us to examine the nature of the alleged errors. We shall go into no labored detail; to do so would require us to transpose bodily into the opinion the elaborate calculations which cover many pages of the master's report. We have indeed a grave doubt as to their pertinency to this issue, and a grave doubt, therefore, whether we should discuss them at all. For the fact that calculations, minute even to abstruseness, were needed to make out the prima facies of the petitioner's claim, is some proof that his claim is of very uncertain tenure. He had agreed to sell, and the co-respondent to purchase, at a price to be fixed by an appraisement. Both parties, therefore, threw themselves upon the judgment of the valuers of the estate ; and, as that judgment, in common with all things human, was fallible, they agreed to accept it with its fallibili-

ties.   The judgment of those appraisers might differ, and it
almost certainly would differ, in a matter so intricate, from the
judgment of any other set of appraisers, however appointed;
it might even differ, as it seems to have differed, from that
of the master; but it was, nevertheless, the controlling judg-
ment, because it was rendered by the umpire whom the parties
in interest had selected.

We have nothing to do with the wisdom or unwisdom of
this arrangement; we are prohibited even from passing upon
its reasonableness.   To quote from Lowrie, J.: " We cannot
set up our reason, or the public reason, for that of the contract-
ing parties, and make a contract for them that is contrary to
their plain intention, without violating the first principles of
freedom, and the very nature of contract relations : " Nelson v.
Von Bonnhorst, 29 Pa. 355.   The rule thus formulated was
reiterated in Singerly v. Thayer, 108 Pa. 291, and Krum v.
Mersher, 116 Pa. 17.   Suppose it was unwise and unreasona-
ble in the cestuis que trust to name the trustees as their
umpire?   They had, nevertheless, a right to select those gen-
tlemen, and by the very act of selection, they canceled, as to
this transaction, all fiduciary relations.   This, at least, is pre-
cisely the reasoning of Lord Eldon, in Ex parte Lacey, supra.
He says: " The rule is this : A trustee who is entrusted to
sell and manage for others, undertakes, in the same moment in
which he becomes a trustee, not to manage for the benefit and
advantage of himself.   It does not preclude a new contract
with those who have entrusted him.   It does not preclude him
from bargaining that he will no longer act as a trustee.   The
cestuis que trust may, by a new contract, dismiss him from that
character."   Apply this rule here.   The trustees by the volun-
tary choice of the cestuis que trust became the agents of the lat-
ter to carry out the sale.   Can it be possible that any mistake,
short of fraud, of those agents, can, after the sale has been per-
fected, and the consideration has been paid, work a dissolution
of the bargain?   Or, reverse the places of the contending par-
ties : suppose the appraisers had over-valued the estate; could
the purchaser ask for a rescission of the contract because she
had paid too much ?

Passing this, however, the error which was most insisted on,
because it lay directly on the surface, was the omission from

the inventory of the profit which had been realized over appraised values, from the sales of certain pieces of real estate. It was alleged that the petitioner knew nothing of any of these sales, and we accept, for the purposes of the argument, although against every doctrine of probabilities, that the statement was true.   But his proposal was to sell at the appraisement; and a new element is now sought to be injected into the proposal, by adding subsequent profits to existing valuations.   This proposition, however, contradicts the definition of an appraisement, that it is a mean between prospective profits and prospective losses.   Tested by the alternative of a sale resulting in a loss, its fallacy is at once apparent.   Certainly, if a loss had occurred, the price under the contract would have remained unchanged, because that price had been fixed by the inventory, and because the risk, both of loss and gain, had been assumed by the buyer.   If, then, the seller could not be affected by a loss, why should he claim to be benefited by a profit?

The master reports, as another error, the difference between the valuation of the testator's interest in the Pratt estate, $102,375, and its previous assessment for the collateral inheritance and succession taxes, at $120,000.   He also finds that the gross and not the net amount of the taxes was deducted from the total inventoried value of the estate, thereby making an under-estimate of $2,217.03.   He names other errors which are not patent, and would require great space to particularize. If we assume that the differences which have been pointed out, and the profits upon the sales, which last were fixed at $63,476.74, should have appeared in the estimate furnished by the trustees, the petitioner would have been entitled to $1,630.30 in excess of what was actually paid him as the value of his legacy.   It is a material circumstance in this connection, that the appraisement upon which the trustees proceeded was the original inventory of the estate, and that the items in abatement which were intended to reach the present worth of the property, were not fixed solely by the husband of the purchaser.   He was assisted throughout the work by his co-executor, a gentleman of acknowledged eminence as a conveyancer, who was also the secretary of the trustees of the Pratt estate, and who had no interest in the transactions with the petitioner.   Attached to the appraisement were two exhibits,

prepared by the trustees, showing the average income of the estate for one year and for five years respectively, and the estimated principal which would be required to produce that income. These schedules were apparently designed to verify the accuracy of the appraisement. They were made the subject of extended comment and laborious ciphering by the master; but as the settlement, under the agreement between the parties, was based upon the appraisement, it is to that paper alone that the limits of this opinion will permit a reference. The masses of figures which the master has drawn from the accounts filed by the executors at dates succeeding the sale in question will also be passed over, for the reason that they are applicable only in case the petitioner shall be reinstated as legatee, and were mainly introduced to show the value of his interest as such legatee at the date of the last account, July 5, 1875.

We are justified in dropping the discussion at this point, because there is another consideration which appears to be conclusive. The sale was completed November 7, 1866, and the first intimation that the petitioner intended to take steps to set it aside was given in December, 1868. In April of the following year, the purchaser notified the petitioner in writing, as she had in the interval verbally notified his counsel, that on re-payment of the purchase-money she would cancel and return his conveyance. Through no fault of either party, the petitioner failed to receive the communication until after the time for re-payment had passed. But he made no effort to secure a longer time; he simply did nothing. It is our belief that the day of grace closed at that moment, and closed by his own choice. We may safely discard the reasons we have heretofore urged, and standing upon this one circumstance, affirm that, whatever other remedy may be within his reach, the remedy proposed by the master, through a rescission of the contract, is not open to the petitioner. If the silence of a party, after notice that a contract has been made in his name by a mere volunteer, will be accepted as proof that he has ratified the contract, as in Phila. etc. R. Co. v. Cowell, 28 Pa. 329, or in Fellowsby v. Kilrit, 17 Ill. 522, certainly silence after an offer to rescind from a party competent to make it, will be held to mean that the contract is to continue. It is impossible that,

where no new reason has arisen, a sale shall be set aside at the instance of one who declined eighteen years ago an invitation extended in good faith to receive back what he had sold.

The master seems to have confounded the distinction between void and voidable contracts. This agreement could not have been void, because he has expressly found that it was free from fraud. If we admit that the petitioner was not bound by it, we must also admit that he was not bound to reject it, and that when he refused to reject it, he confirmed it. He may sue for damages for the fraud, if there is any, but his suit is a confirmation of the contract: Pearsoll v. Chapin, 44 Pa. 14. The master's benignant ruling permits the petitioner to use the money he acquired under the purchase as his own, to reject the offer for a rescission of the sale, and to come in at last as if no sale had been made. See further as to this distinction and as to purchases by trustees, Beeson v. Beeson, 9 Pa. 279; Lazarus v. Bryson, 3 Binn. 54; Painter v. Henderson, 7 Pa. 48; Musselman v. Eshleman, 10 Pa. 394; Campbell v. Walker, 5 Ves. 678. We may add, just here, that the executors were bound to carry out the wishes of the cestuis que trust, and that hence, as to the respondents, the sale was a forced one. They could buy at such a sale without even the imputation of fraud: Fisk v. Sarber, 6 W. & S. 18.

This, in our judgment, disposes of the decree which the master has indicated as proper. Upon the only other question which can be raised we are equally clear. The petitioner is not entitled to recover for the diminution in the price of his interest, which may have been worked by any errors in the appraisement from which that price was made up. If the reasons which we have endeavored to set out are inadequate to this conclusion, that in an estate of such intricacy no appraisements could be demonstrably correct, and that no two appraisements could be alike, and that in adopting this standard of values the contracting parties waived all errors which were untainted by fraud, a final reason presents itself in the doctrine of laches.

That doctrine, which is not limited in its scope by any forced analogy to the statute of limitations: Evans' App., 81 Pa. 278, has a two-fold purpose. It is intended as a check to litigation, and as a test of the good faith of a litigant. The presumption

against the party who sleeps upon his claim, is not only that the claim never existed, but that the claimant never believed in its existence. The case of the petitioner may be fairly judged by this criterion. With his instinct for litigation fully alive, he delayed the formal assertion of his rights until nearly five years after the bargain which he repented of had been executed. The inducement to this tardy controversy was that his sisters received for their shares a larger consideration than his own share had yielded him. No sane mind would accept the conclusion that an increase of price in the second sale was, in itself, proof that fraud had been perpetrated in the first sale. The evidence was positive, however, that, in the interval, market prices had risen, and a profitable sale had been effected under exceptional circumstances ; and that, in addition to these incidents, a desire to end a vexatious contest had induced the purchasers to advance upon their bids. In the hope of securing a part of the profits which neither he nor any one else had anticipated, he embarked upon what may be emphatically called a cruise of discovery ; at his call, week after week, books and papers were transported by cart loads to the office of the master ; and years of patient effort on the part of that officer and of counsel have unearthed errors, untouched, as the master reports, by the suggestion of fraud, whose aggregate falls far short of the expense of this inquiry. In the light of these events, the letter of the petitioner, in which he first announced to the respondents his purpose to sell, seems to have been prophetic. It concluded thus : "I hope my dear sir, you will make me a proposition similar to the heirs in West Virginia, as you have signified your intention to buy their shares. As regards not allowing me enough, and my saying in after time I did not receive its proper value, all I can say is, that I have too much confidence in you as a high-toned gentleman, and am willing to accept whatever you consider a fair value." When we recall the fact, that just before the date of that letter, its author had secretly striven to destroy the legacy given to the person whom he addressed by these courtly epithets, and that, some years after its date, he evinced his gratitude and his confidence by charging that person with fraud, we do not fully appreciate the pathos with which counsel for the petitioner insisted that the wrong of which he complains

Arguments.

was invited on his part by the artless innocence which suspects no evil.

Counsel for the purchaser agreed that certain errors, which are not now specified, should be the subject of an allowance to the petitioner, and the present decree will be entered subject to that agreement.

The exceptions of the respondents are sustained, and the petition is dismissed.[1]

A formal decree reversing and setting aside the conclusions and findings of law of the auditor, and dismissing the petition at the cost of the petitioner, was signed on April 7, 1888. Applications for a re-argument and for amendment of the decree were subsequently refused; whereupon, the petitioner took this appeal, specifying that the court erred:

1. In entering the decree dismissing the petition.[1]

3, 7. In making the findings embraced in [ ] [3] [7]

17. In finding that the petitioner was barred by laches.

23. In dismissing the petitioner's exception as to the question of fraud.[23]

*Mr. Arthur M. Burton* and *Mr. Daniel Dougherty*, for the appellant:

1. The court erred in finding that the parties to the sale stood at arm's length and were in law equally matched. This is the case of a sale of an undivided interest in an estate by a cestui que trust, a young man without means, without employment, without any knowledge of business, and ignorant of values, to the wife of the trustee, at a valuation previously made by her husband and his co-trustees, as to which the vendor had no independent advice or counsel, the executors failing to communicate to him information which they had, and the valuation made by them proving to be incorrect and greatly below the actual value, even on the basis upon which it was made. The actual dealing was between the cestui que trust and his trustee, and prima facie, such a purchase by a trustee cannot stand: Spencer's App., 80 Pa. 317. And the rule is the same whether the trustee buys for himself or for a third party: Huguenin v. Baseley, 14 Ves. 273; Gordon v. McCarty, 3 Wh. 407; Dundas's App., 64 Pa. 325. While it is not con-

tended that an executor or his wife may not buy, it is necessary that there be affirmative proof of the fairness of the transaction: Gibson v. Jeyes, 6 Ves. 266; Shea's App., 121 Pa. 320.

2. That the appellant, instead of employing experts to examine the accounts and calculations, and consulting counsel, chose to place confidence in the representations of the executor, is no answer to his complaint that such confidence was abused: Redgrave v. Hurd, L. R. 20 Ch. D. 121; Hunt v. Moore, 2 Pa. 107. Clearly, Davidson v. Little, 22 Pa. 252, cited by the court below, is not authority for holding that the present case is an exception to the rule which annuls a purchase of an expectant interest from an heir, for mere inadequacy of price. In this case, moreover, the appellant could sell only to a person whom the executors would favor; no outside party could get the information on which to bid. But the rule is applicable to sales of vested estates in remainder and reversion, and also to estates in possession: 1 Story's Eq. J., §§ 335, 337; Aylesford v. Morris, L. R. 8 Ch. App. 484; Haygarth v. Wearing, L. R. 12 Eq. C. 319; Fry v. Lane, L. R. 40 Ch. D. 312. The vital question is, whether the executors fully performed their duty by giving the appellant all the information they possessed, and the findings of the auditor, which show that they did not do so, and which were not excepted to, should be conclusive on the court: Scheppers' App., 125 Pa. 598; Morgan's App., 125 Pa. 561.

3. The court erred in finding that the trustee was not a party to the contract, but acted by consent as the agent of both parties. If he did so act, however, the contract is voidable on that account: Story on Agency, § 211; New York etc. Ius. Co. v. Insurance Co., 20 Barb. 470; s. c. 14 N. Y. 85; Utica Ins. Co. v. Insurance Co., 17 Barb. 132; Florance v. Adams, 2 Rob. (La.) 556 (38 Am. Dec. 226). The court erred, also, in disregarding the finding of the auditor that the value of his interest was incorrectly represented to the appellant. The auditor's conclusion that there was a relation of confidence in this case, which bound the executors to exhibit the truth as it existed, was correct: 1 Perry on Trusts, § 179; Babcock v. Case, 61 Pa. 427. Equity relieves even from the mistakes of a third person: Jenks v. Fritz, 7 W. & S. 201. But the auditor's conclusion that the misrepresentation in this case was

mistaken, without being fraudulent, is not in accordance with the facts reported by him. Fraud does not necessarily mean deceit and circumvention; it includes all acts, omissions and concealments which involve a breach of a legal or equitable duty, or of a trust or confidence justly reposed: 1 Story's Eq. J., §§ 171, 187; Aylesford v. Morris, L. R. 8 Ch. App. 484; Moxon v. Payne, L. R. 8 Ch. App. 881; Evans v. Llewellyn, 1 Cox Ch. 332; Tyson v. Passmore, 2 Pa. 124; Bennett v. Judson, 21 N. Y. 238.

4. The absence of wilful fraud will not relieve one who misrepresents, and thereby obtains an unjust advantage: McCall v. Davis, 56 Pa. 431; Doggett v. Emerson, 3 Story 700. In this case, the principal elements of fraud are made to appear, and the inference of fraud necessarily follows. The manner in which the mistakes occurred not being explained, they cannot be treated as mere accidents, especially in view of their number and magnitude. A prima facie case of fraud was made out: Griswold v. Gebbie, 126 Pa. 353. But if the misstatements were mere mistakes, to claim the benefit of them is fraud, and is sufficient ground to set aside the conveyance: 1 Perry on Trusts, § 172; 1 Story on Cont., § 621; Elwell v. Chamberlain, 31 N. Y. 611. The conclusion of the court that by not replying to the offer of Mrs. Lippincott, which he failed to receive until after the time limited for its acceptance had passed, the appellant acquiesced in the contract of sale as originally made, is erroneous: Phila. etc. R. Co. v. Cowell, 28 Pa. 329; Thompson's App., 103 Pa. 603; De Bussche v. Alt, L. R. 8 Ch. D. 286; Phillipson v. Gatty, 7 Hare 516. Nor is he barred by laches: Gowland v. De Faria, 17 Ves. 20; Hill v. Epley, 31 Pa. 334; Beaupland v. McKeen, 28 Pa. 124; Kilbourn v. Sunderland, 130 U. S. 505; Evans's App., 81 Pa. 301; Byrne v. Frere, 2 Moll. Ch. 171; 2 Perry on Trusts, § 867; Price's App., 54 Pa. 479; Ferris v. Henderson, 12 Pa. 54; Daggers v. Van Dyck, 37 N. J. Eq. 130; Lewin on Trusts, *874; Wollaston v. Tribe, L. R. 9 Eq. 44; Murray v. Palmer, 2 Sch. & Lef. 474; 1 Perry on Trusts, § 230; Morse v. Hill, 136 Mass. 66; George's App., 12 Pa. 260; Johnson's App., 114 Pa. 140.

*Mr. John G. Johnson* and *Mr. George W. Biddle* (with them *Mr. John J. Wilkinson*), for the appellees:

The questions raised by this appeal may be reduced to two very simple ones:

1. Can a residuary legatee, being the wife of an executor of an estate, purchase the share of another residuary legatee through the medium of her husband, in the absence of fraud; or, does the rule which forbids a trustee from buying at his own sale, apply to such a case and render the sale voidable at the will of the vendor? The authorities support the affirmative of the first alternative, and show that there is nothing in this case to take it out of that rule: Ex parte Lacey, 6 Ves. 626; Barwell v. Barwell, 34 Beav. 371; Fox v. Macreth, 2 Cox 327 (1 Lead. Cas. in Eq. 115); Coles v. Trecothick, 9 Ves. 245; Graves v. Waterman, 63 N. Y. 657; Binney's App., 116 Pa. 169; Delamater's Est., 1 Wh. 362; Smith's App., 115 Pa. 319; Morse v. Royal, 12 Ves. 355; Moth v. Atwood, 5 Ves. 845.

2. If such a sale is voidable, is not the vendor estopped from seeking to set it aside after an offer to re-convey to him, upon re-payment of the price, with interest, has been made to but not accepted by him, and after he subsequently allowed the matter to rest for two years without moving to have the sale set aside? Even when the sale is forbidden by the policy of the law, an attempt to set it aside must fail unless made within a reasonable time, and less than six years may be an unreasonable time; Evans v. Borie, 81 Pa. 278; Ashhurst's App., 60 Pa. 315; Clegg v. Edmundson, 3 Jur., N. S., 299. After an offer to cancel the sale, a further delay of two years is altogether inadmissible, especially when there has been a subsequent accidental rise in the value of the estate. The rise and fall of values cannot thus be speculated upon.

OPINION, MR. JUSTICE STERRETT:

Appellant claims under the will of James Dundas, deceased, proved July 10, 1865, in which the testator directed his residuary estate to be divided into forty equal parts or shares, five of which he gave to the four children of William H. Dundas, one of whom is appellant. He thus became entitled to one fourth of five fortieths, or one thirty-second of said residuary estate. On September 9, 1865, an inventory and appraisement of the estate was duly made and filed in the register's office. In January, 1866, appellant, then about twenty-four years of age,

received from Mrs. Lippincott, another of the residuary legatees, $1,500, in anticipation of distribution. Out of the first distribution of income, made about six months after testator's decease, he received his share, $533.32, and out of the next distribution made six months later, he received nearly $5,000.

Appellant's first thought, almost immediately after testator's death, appears to have been to attack and set aside the will, on the ground of undue influence exercised by one of the appellees and her husband. Eminent counsel were consulted as to the propriety of that course, but it does not appear to have been encouraged. Having abandoned the idea of contesting the will, he then consulted several others in regard to the propriety of selling his interest in the residuary estate, and in that connection he and one of his legal advisers, in 1865, examined the inventory and appraisement. At that time, his attorney informed him that the assets of the estate were appraised at the lowest figure to save collateral inheritance tax. On several occasions he was advised not to sell, but notwithstanding that advice, and the reasons suggested in support of it, he persisted in endeavoring to find a purchaser. Shortly after he received his share of the second distribution, in July, 1866, he wrote to Mr. Joshua Lippincott, one of the executors, proposing a sale to him. In that letter, referring to a suggestion that had been made by his sister, he said: "As regards not allowing me enough, and saying in aftertime that I did not receive its proper value, all I can say is, that I have too much confidence in you as a high-toned gentleman, and am willing to accept whatever you consider a fair valuation." In his reply, Mr. Lippincott emphatically declined to entertain the proposition to purchase, giving as a reason therefor, that being an executor he could not do so. He suggested, however, that appellant might sell his interest to others who were entitled to participate in the estate. As the result of that correspondence, one or two visits to Philadelphia, and conferences with the executors, etc., appellant arranged to sell his remaining interest to Mrs. Lippincott, wife of one of the executors, and also a residuary legatee.

Under the will she was entitled to three fortieths, and her two children together to twenty-eight fortieths, thus making the holding of the family more than three fourths of the resid-

Opinion of the Court.

uary estate. A number of interviews and conferences had previously taken place between appellant and Mr. Smethhurst and Mr. Lippincott, two of the executors, in regard to the value of the estate, which finally culminated in a calculation prepared by the executors upon three different bases. This was submitted to appellant and was finally agreed to by him. The sale was consummated early in November, 1866, and the consideration, $10,000, paid by Mrs. Lippincott out of her private estate. At that time, appellant expressed himself as fully satisfied with the transaction. This is evidenced by his written declaration delivered to the purchaser with his deed. In that he says: " I have examined and considered the condition of the estate of the late James Dundas, and certain statements showing the present value thereof furnished to me by the executors, all information relating to the subject having been freely given me by the executors of James Dundas, and I am satisfied that a fair valuation of the whole residuary estate in which I am interested, including the principal of the annuities hereafter to fall in, is the sum of $441,682.40, and upon this basis I have requested Mrs. Agnes Dundas Lippincott to purchase of me my one fourth of five fortieths of said residuary estate, which she has agreed to do, and I am acting in this sale of my residuary estate with a full knowledge of my interest in said estate, and without any persuasion or influence of any kind."

The first intimation of any dissatisfaction with the sale of his interest to Mrs. Lippincott, was given to her counsel in December, 1868, when appellant and his counsel appeared at the audit of the first account of the executors and notified the auditor that they intended to make an application to set aside the conveyance made more than two years before. Early in 1869, both of the learned counsel who appeared for appellant before the auditor were informed by Mrs. Lippincott's attorneys that she would re-convey the interest she had purchased from appellant upon re-payment of the purchase money with interest. No notice was taken of this offer, and in April, 1869, it was renewed in writing, with a limitation as to the time within which it might be accepted. It was not accepted, nor was there any application made for a modification of the offer, or an extension of the time within which it might be accepted.

In April, 1871, appellant's petition, in which his grievances

are fully set forth, was presented to the Orphans' Court, praying that the conveyance of his interest in the residuary estate to Mrs. Lippincott be set aside, and that he be permitted to participate in the distribution of said estate as though said deed had never been made. Thereupon Mrs. Lippincott and her husband, and the surviving executors of the will, appeared and answered the petition, denying all the allegations of fraudulent valuation, misrepresentation, etc., upon which the court was asked to set aside the conveyance. The issues of fact raised by the petition and answers were referred to an auditor, whose very able and exhaustive report, and the action of the court thereon, are now before us.

On the main questions of fraudulent valuation and misrepresentation charged in the petition, the learned auditor's conclusions, as stated by himself, are as follows:

" The representation of the value of the estate, and the interest therein proposed to be sold, the auditor finds was incorrect in the premises upon which the estimate of value was founded, and in the methods through which the resultant estimate was reached. . . . . The auditor, however, after a most thorough and careful and repeated examination and consideration of the actual and absolute or naked facts of the case, which covered a very wide range, cannot find that there was in this incorrect representation and valuation, fraud upon the part of the executors who had thus placed themselves in such a relation of confidence to the seller. The auditor finds as a fact that this representation of the condition of the estate, and of the value thereof, and of the seller's interest therein, was incorrect, but that it was not fraudulent. It was a mistake, and such a mistake as would not unnaturally arise from the peculiar character of the assets of the estate and its complicated nature, and the complex relations of the parties concerned. The auditor is of opinion, and so finds, that, however mistaken the executors were, yet they honestly believed that the representations they made to the seller, the petitioner, were correct and fair for the purposes in view."

These conclusions of fact, we think are quite as favorable to the appellant as the evidence warranted. The facts and circumstances from which they are drawn by the auditor are so fully and clearly set forth in his report, and in the opinion of

Opinion of the Court.

the court, that we have deemed it unnecessary to do more than outline them sufficiently to indicate the relation of the parties to each other and the principles involved in the contention.

While the record is somewhat voluminous, and the specifications of error very numerous, the controlling questions are very few. An examination of the record, and full consideration of the exhaustive arguments of counsel, have led us to the conclusion that the cardinal question in the case is, as tersely stated by the learned counsel for appellees: " Can a residuary legatee, being the wife of an executor of an estate, purchase the share of another residuary legatee, through the medium of her husband, in the absence of fraud; or, does the rule which forbids a trustee from buying at his own sale, apply to such a case, and render the sale voidable at the will of the vendor?"

There is no doubt as to the facts of which the first branch of this question is predicated. The relation of the parties to each other is strictly correct. As the learned auditor has correctly found, no fraud was practiced or even meditated; nor was there any mistake, on the part of the executors, or either of them, that can, under the circumstances, be regarded as tantamount to fraud. Assuming, for the sake of argument, that there was a mistake in their mode of estimating the value of the residuary estate, it was, as the learned auditor says, "such a mistake as would not unnaturally arise from the peculiar assets of the estate," etc.; and, "however mistaken the executors were, they honestly believed that the representations they made . . . . . were correct and fair." The facts being so, there is neither reason nor authority for the position that, under such circumstances, and in the absence of fraud, actual or constructive, one legatee may not purchase the interest of another legatee. It is a mistake to contend that the rule which forbids a trustee from buying at his own sale, applies to such a case, and in any manner renders the sale either void or voidable, at the will of the vendor. Without questioning the soundness of the authorities relied on by appellant, it is sufficient to say, that they are inapplicable to the controlling facts of this case.

In connection with his review of the facts and circumstances leading up to the sale, the learned judge of the Orphans' Court, after fully considering the relation of the parties to the transaction, and other questions involved, came to the conclusion

" that the parties to the sale stood at arm's length, and were, in law, equally matched ; " that there was nothing in their relation to each other, or in the action of the executors, that ought to have the effect of rendering the sale either void or voidable; that it was not void, because it was not tainted with fraud, nor was it voidable at the election of appellant on the ground of unintentional mistakes " in the premises upon which the estimate of value was founded, because appellant agreed to sell and Mrs. Lippincott agreed to buy at the price ascertained by the statement and estimate furnished and submitted by the executors, and that, in the absence of fraud, or such mistake as is tantamount thereto, both parties were bound by their agreement to accept, as correct, the statement and estimate which was honestly prepared and submitted by the parties whom they voluntarily selected for that purpose, especially after approval of the estimate and execution of the contract of sale based thereon."

These conclusions were warranted by the facts found by the auditor and the authorities cited by the learned judge in his able and exhaustive opinion. It is unnecessary to make further reference to the facts of the case, or to review the authorities cited and relied on as applicable thereto. Enough has been said to show that the opinion of the Orphans' Court is an ample vindication of the correctness of its decree. The sale in question was clearly not void, because the fact that it was not tainted with fraud has been conclusively established. Assuming, for the sake of argument, that it was voidable at the election of appellant because of unintentional errors in the estimate by which the value of his interest in the residuary estate was ascertained, it was his duty to act with reasonable promptness. That was not done. His delay was inexcusable, especially in view of the offer of Mrs. Lippincott to re-convey on payment of the amount he received from her with interest. For reasons given in the opinion above referred to, we think the court below was also right in holding that appellant was estopped by his laches from assailing the validity of his conveyance.

Decree affirmed, and appeal dismissed at the costs of appellant.